Good morning, and welcome to the Richard Chambers Courthouse here in Pasadena. This is the time set for the case to be reheard en banc of David Scott Dietrich v. Ryan Thornell. It looks like we have Arizona coming to California here today, so the parties are ready to proceed. You may come forward. And just before you begin, I just want to test Judge Gould. Can you hear me? Yes, I can hear you perfectly. Judge Thomas, can you hear us? Yes. Okay, great. Thank you. Thank you. May it please the Court and Mr. Lewis. My name is Amy Armstrong, and this is Emily Skinner. We're from the Arizona Capital Representation Project, and we represent Mr. Dietrich in these proceedings. I will do my best to reserve three minutes for rebuttal, and I'd like to focus my comments today on the ineffective assistance of counsel at sentencing claim and the causal connection claim. Dave Dietrich was sentenced to die after his counsel spent ten and a half hours preparing for his sentencing. Counsel failed to conduct a basic life history investigation. He did not collect records. He did not interview witnesses. He did not explore challenges to the aggravating factor, nor did he consult with expert witnesses. This is despite the fact that a pre-sentence report raised red flags that Mr. Dietrich suffered childhood trauma and resulting mental health problems. In initial post-conviction, counsel recognized the Sixth Amendment failure and proffered important social history information, including evidence of a complex birth defect and repeated childhood head traumas, and a neuropsychological report demonstrating that Mr. Dietrich had impaired brain functioning that would have been worse at the time of the crime, and a conclusion that Mr. Dietrich's, quote, decision-making, especially when compromised by alcohol, was not based on any consequence-driven thought process, but rather a learned behavior that bypassed right or wrong, end quote. Counsel, could you help me for a second and point out what particular brain defect was found, what objective evidence there was of any brain dysfunction? Absolutely, Your Honor. So in post-conviction, the social history witnesses provided testimony about motorcycle accidents that were not in front of the sentencer, and the neuropsychological testing conducted by Dr. Briggs included what still some consider the gold standard, the Halstead-Ritan battery for neuropsychological functioning, and Mr. Dietrich scored impaired on 30% of the subtests of the Halstead-Ritan. And what was important is that included his performance on the category test, which is a test that measures executive functioning. And Dr. Briggs gives vivid account in his report of how remarkable the impairment was on the category test, because Mr. Dietrich would actually intellectually understand the correct response, know the correct response, but he would not be able to curb his impulse to pull the lever on the incorrect response. And Dr. Briggs found that behavior very noteworthy. Dr. Briggs also opined that these impairments created a, quote, mindset where instinct took over and reason could not be accessed. Point out to any physical impairment that Dr. Briggs found. Well, Your Honor, with the neuropsychological, so perhaps Your Honor is asking for if there was brain imaging or something like that. Was there brain damage found, because he said there was a recovered, this is a recovered, recovered from what? From what condition? I had difficulty finding any condition from which he recovered, or that he hadn't recovered indeed when Dr. Boyer saw him in 1991. Right. Well, a couple of things. So when Dr. Boyer saw him, Dr. Boyer was not a neuropsychologist and did not perform any neuropsychological testing. She only conducted personality testing and clinical interviewing. In terms of the actual damage, what the neuropsychologist looked at. Dr. Boyer did find that there was no functional loss. She found that there was no impairment, but she also didn't test for impairment. So our position on that was that she wouldn't. Made it up? Well, no, but she, based on what she did, she found no impairment, but she's not a neuropsychologist and she didn't administer any neuropsychological testing. And in fact, the district court found that no evidence, either in state court or in district court, undercut the evidence that Mr. Dietrich has neuropsychological damage. So that really wasn't an issue for the district court. For the district court, it was the consequence. But in terms of what Dr. Briggs looked at to explain the damage that he saw on the Halstead Ritan test, was the repeated, well, the head traumas in childhood, the repeated toxic exposures. Mr. Dietrich was encouraged by his stepfather to consume massive amounts of alcohol, beginning at a very early age, around 11 years old. And even though the sentencer knew that Mr. Dietrich began drinking at a young age, the sentencer did not know the quantities until post-conviction. So the quantities were massive. The motorcycle accidents were unknown of before post-conviction. And the childhood trauma, in addition to the, really the other important piece that Dr. Briggs had that the sentencing, that the experts, the court experts before at the sentencing didn't have, was the significance of the birth defect. So it is true that the sentencer knew that Mr. Dietrich had a cleft palate and underwent surgeries to correct it. But the sentencer knew nothing beyond that. The sentencer did not understand that Mr. Dietrich was separated in infancy from his mother for extended periods of time. Is your argument that the cleft palate indicates some neurological defect? Yes. And that is confirmed later in federal habeas by Dr. Cunniff, who is a medical doctor, a geneticist, and an expert in fetal alcohol-related type illnesses or diseases. And he found that Mr. Dietrich's impairments were consistent with alcohol-related neurological deficits. So, yes, all of these things, this constellation of factors, really informed Mr. Is your answer that cleft palate indicates brain injury? It can, Your Honor. Did any doctor find that? The connection between the two? Yes. They did. More explicitly in habeas, but even in post-conviction, Dr. Briggs was looking at all of this evidence together. Okay. Thank you. You've answered my question as well as you could. So as we touched on, there was quite a bit of differences between the sentencing evidence and the evidence presented in post-conviction. It's important to remember that the post-conviction court provided no investigative funding for Mr. Dietrich. So the social history evidence that was greater developed later in habeas was really inhibited by the fact that there was never a mitigation specialist or investigative funding provided in post-conviction. Despite that, post-conviction counsel was able to obtain declarations from Mr. Dietrich's mother. She's the one that goes into more detail about the severity of the cleft palate, the resulting severity, where we get more information about the alcohol consumption that was happening during childhood. Can I ask you this? We can divide the evidence really into two rough categories. One is basically sort of what happened to family history and so on, and the other is the professional diagnoses. For the moment, addressing just the narrative history, how much was before the sentencing judge on narrative history of what happened to him compared to what came in later? What additional evidence comes in? Yes, Your Honor. There is additional evidence. Admittedly, it's not as much as in habeas because it was not funded, but what post-conviction counsel was able to develop through speaking with Mr. Dietrich's mother and stepfather was that, as I said earlier, although they knew Mr. Dietrich was born with a cleft palate, they didn't know about the severity of the condition, the multiple surgeries, the separations, the excessive bleeding down the throat that caused Mr. Dietrich to stop breathing for an indeterminate amount of time. The sentencer knew of childhood abuse but did not know that Mr. Dietrich received the worst of it because of his bedwetting or that his stepmother would call him Pissy Baby and hang his soiled sheets from the windows or that she dyed her hair to match the children and forbade them from mentioning her mother. The sentencer didn't know that when Mr. Dietrich finally was reunited with his mother after years of this abuse that he was never the same again. He simply was not the same child. As I mentioned, the sentencer knew of the drinking but didn't know the quantities. The sentencer, those are the main social history, the new social history evidence that came out in post-conviction. But again, our position is that it was unreasonably limited due to the state court's refusal to provide investigative funding. And on the professional diagnosis, was there something different from before and later? Can you highlight what you think are the most significant? Yes, Your Honor. I think what's most significant is this, a few things. One is that Dr. Boyer says, as Judge Baya was mentioning, says that there's no cognitive dysfunction. Dr. Briggs says there is cognitive dysfunction. He says it's recovered. But he also says that the performance was in the normal range of neuropsychological function, that's a quote. And the score on the general neuropsychological deficit scale is within the normal range. And that's repeated again on page six of the report. The improvement in function occurs over time from the childhood traumas, physical traumas at least. So why are they really different in kind? You're absolutely correct, Judge Graber, and here's why we think it's very different. So the general measure is looking at everything. It's looking at how we hear, how we see, a lot of neuropsychological functions that aren't necessarily as relevant or as weighty when it comes to assessing moral culpability in a criminal case. But where he was impaired, plainly, was in the frontal lobe and in his executive functioning. And Dr. Boyer, without doing any neuropsychological testing, says there's an absence. Dr. Briggs says that generally he's in the normal range now. At that point, he had been incarcerated. Mr. Dietrich had been incarcerated for over 11 years. We expect healing because there was no longer alcohol access to, excuse me, access to drugs and alcohol. So we know that Dr. Briggs explicitly says that's a recovered picture. We also know that Dr. Briggs, and this is a quote at 5ER 1198, there is likely an interaction between his emotional status and his mild neurological deficits causing greater overall impairment in function. And we believe that's an important conclusion in this case because it recognizes not only this organic brain damage, this neuropsychological deficit, it's not acting alone, but it's in concert with the trauma and his inability to emotionally regulate. And then lastly and importantly, this is all connected to the crime because the conclusion finds that these impairments would be aggravated, they would be much worse when consuming alcohol. And there's no dispute in the record that Mr. Dietrich and his co-defendant consumed copious amounts of alcohol that night and were highly intoxicated. Can I ask you about this recovered picture because it looks like Dr. Briggs' comment was related to Mr. Dietrich's functioning and represented what he called a recovered picture. Is that right? And I'm trying to understand the significance of that and whether it is significant when Dr. Briggs was retained to opine on Mr. Dietrich functioning in 2002, not his functioning in 1989. Help me understand the significance of that. Yes, Your Honor. I think that's exactly at the center of it is really in all of these cases, it's not uncommon that we're having to do psychological and neuropsychological assessments years, sometimes decades after the crime. And so what we're asking forensic experts to do is a retrospective evaluation in essence. In a perfect world, sentencing counsel would have retained a neuropsychologist in light of the red flags in the PSR and would have undertaken this neuropsychological testing closer to the time of the crime. So we would have a clearer picture of what that impairment looked like then. But what we have is testing done a decade later and we're still seeing impairment on 30% of these tests in the areas that are very important. So to me, what the recovered picture means is that even after healing, we still see damage. And what Dr. Briggs was saying as I read his report is that we would have seen more earlier. And if this court finds that the state court was unreasonable under 2254 D1 or D2 for the way that it analyzed Strickland in light of this evidence, then you also get to look at the evidence in federal court, which bolsters Dr. Briggs' conclusion. Nothing that the experts found in federal habeas was in tension with or undermined. Even the district court found that there was no evidence to undercut the defense experts' findings that Mr. Dietrich had cognitive impairment. And remember, these tests are done even a decade after the first. So it's pretty powerful evidence. I think it's pretty, a plain reading of this evidence shows that Mr. Dietrich continues to be impaired even after his brain had the opportunity to recover for decades. Counsel, you mentioned Strickland, which of course is key here.  And assuming that we agree with you that counsel's performance was deficient, I'd appreciate your addressing the prejudice prong. Why was this prejudicial in light of the heinousness of the crime and the other factors? Yes, Your Honor, absolutely. So under Strickland, the reason this was prejudicial is really twofold. This was sort of classically mitigating evidence. When you look at the U.S. Supreme Court's cases where they have found relief under D1, D2, Wiggins, Porter, Rompia, Sears, you see organic brain damage as a common thread. It is a very powerful mitigator. It would have mattered. It would have strengthened the G1 mitigating factor, which the court already found on the evidence before it, would have given it much more weight. Notably, the reason that G1 was dismissed in terms of its weightiness was because there wasn't any causal connection, because, well, let me frame that more specifically. It was, the weight of G1 was minimized because the sentencer found that Mr. Dietrich was cognizant, aware of his surroundings at the time. So the Arizona courts, particularly at this time, were looking very focussly, almost myopically, at the connection between any impairments, any abuse, and the criminal act. And so being able to demonstrate that Mr. Dietrich, between his emotional dysregulation and his cognitive impairments and his intoxication, would have really not been able to curb his impulses, that would have been heavy mitigation. The other side of it is that there's only one aggravator, F6. Both prongs were found here, especially cruel and especially heinous or depraved. This is a weighty aggravator, we don't deny that. But the same evidence, the same mitigating evidence about Mr. Dietrich's neuropsychological dysfunctioning and all the other things that Dr. Briggs found relevant to that would have reduced the weight. Because both F6 cruelty and F6 heinousness or depravity require that the defendant's state of mind be taken into account. And so, that's why we believe that there's actually very weighty evidence of prejudice. There's weighty evidence about his state of mind, though, that in terms of the things that he said afterwards and so forth. That suggests that it was not an impulsive act, so do you think it would have changed that calculus? Well, we do believe that even if you take the co-defendant, Alan Charlton's word completely for what happened that night, which we believe is very problematic, but if we do, this still fits in to the pattern or the concern that Dr. Briggs had about Mr. Dietrich's functioning. In that, there's an emotionally dysregulated situation, there's anger over bad drugs, there's extraordinary intoxication, and then the impairments are always there. We do see this crime as impulsive in terms of, I believe, your- Hardest part for me. Okay. I don't see this as an impulsive crime. There seemed to be so much time to stop. I hate to interrupt you, but I just wanted to let you know, this is an important part for me, so I'm listening carefully. Okay. How do we get to impulsivity on this? Yes, absolutely. So here's how, and this is really based on the record. So I don't think there's any issue with this court being able to consider these types of facts. So the evidence at the house that Mr. Dietrich was making threats, the threat, I'll kill you, which was used to support premeditation. When you really look at that evidence, that was overheard from a witness who was in a separate room and didn't know who was talking. And the witnesses who were in the room, I believe it was Tammy Winsett who was talking to Mr. Charlton, and he was the one who was making threats about killing. So that's an important piece of evidence that this wasn't impulsive, that it was premed. Can you- I'm sorry to interrupt you. Oh, no. I just need to check, because I don't see the two judges on, and I want to make sure that they're listening to this. Sure, so we can just take a moment, please. I'll take a sip of water.  Recording in progress. All right. Just, Judge Gould, can you hear me? Now, yeah, my screen was frozen for a while. Yes. But I can hear now. Judge Thomas? Judge Thomas, can you hear me? Yes. All right. Thanks.  You can put 20 more seconds on the clock, if that's possible. And then, Judge Kristen, I'm sorry to have interrupted you, but you can proceed. I think we were- I was piggybacking on Judge Graber's question, actually. I just asked you to focus on impulsivity. And you were mentioning the reasons that you thought that there were indications that other- that someone else, that Charlton had been the person threatened to kill her before she left the home. Right. And what I started to say, I think, about the time we got the interruption from the screen, was that there's other evidence that she was led from the home at knife point, and that he led her- Dietrich led her from the home at knife point. Hence, my- and it's hard for me, maybe you can help me out with this, it's hard for me to know how long this took. But it strikes me, and I really looked at the record on that point, but it strikes me as this- and this is where I think I interrupted Judge Graber's question, forgive me, that this was not impulsive. It took a long time. There was a lot of opportunity to stop, and they didn't stop. That's my hang-up on this part of your argument. I understand your question. So this goes to Judge Graber's cruel- it's the aggravator. Cruel, depraved. Yes, Your Honor. I understand. So you mentioned the difficulty of ascertaining the time in the record. This is another part of Charlton's testimony that's very problematic. We know from the record that 9-1-1 is called, I believe, around 1-23 in the morning. And we know that Mr. Dietrich and Mr. Charlton don't show up at Carbonell's somewhere between 4 and 6.30. There's a lot of time unaccounted for. This is why Phil Schell's testimony was so important, and we believe credible, because his testimony lined up better with the timeline in terms of how long the parties were missing from the house. The other thing that was really compelling about Phil Schell, completely unusual for a jailhouse confession type evidence, is that he had no benefit from testifying. Let's look at- I think you've made that point, and I think persuasively. He's not the typical jailhouse informant. I appreciate that point. But even looking at his testimony, how long do you put this sequence? Where do you peg it? Well, I think it's just a different crime if Charlton's confession is the actual truth, and Phil Schell's- Now that's kind of switching courses. I was trying to get back to the cruel and depraved and how long this all took. It seems to me it was a very protracted period. She would have been terrified from the time she was led from the home at 9 o'clock. The truth is we just don't know, Your Honor. We really don't know. But you're arguing on positivity, though, and that's the problem. Here's what we do know. If we take Alan Charlton's testimony as truth, we know that he describes looking over while he's driving, Miss Souder being attacked. I mean, rapid succession. When you look at the Arizona Supreme Court's cases, even on a special cruelty, and you look at cases with a lot of stabbings, Bocharski, State v. Bocharski is one. State v. Montano, there was 179 stabbings. So the stab wounds, these kinds of things can't always tell the full story. We don't know how long they were in the car exactly. But we do know that whatever happened, if we take Alan Charlton's testimony as true, that it happened quickly. Now, there's some notes about— Wasn't there a completely different witness who testified that your client threatened to kill her on the way to the car? Your Honor, I will double-check that. But my memory is that the witness who provides that testimony was in the other bedroom. And then the one that was out says that Charlton says it. But to the point, what I was about to say was that there's no doubt that this is cruel. And our position has never been that there would be zero evidence of a special cruelty if counsel had been affected. Our position has been that the weight would have been reduced. And we also think the weight would have been greatly reduced on the heinousness or depravity finding. Right, but you're particularly arguing—I hate to beat this. No, no, no. But you are affirmatively arguing impulsivity. At least you did on remand. And that's why it's difficult for me. I don't know that there was—I don't know how prolonged it was. It's very hard for me to— It's very hard for us to tell, Your Honor, on the record. But I will say it is impulsivity. But it's also what's important about Dr. Briggs finding— Just give me your best shot at that. It's impulsive because why? It's impulsive because it was not premeditated like a lot of the other cases we see. For example, Jones and Kayer, where there's a robbery and there's a plan and there's preparation and they know they're going to take someone's life, this was somebody losing their temper and not being able to regulate. And what's important is that Dr. Briggs doesn't just talk about impulsivity, but he also talks about that inability to redirect. And I think that that is an important part of this. I don't think the term impulsivity quite captures the impairment. It's the inability to change a course of action once it gets started. And I do think that that's what we see here even under Charlton's version of events. If I may, just because I'm running out of time, I'd like to touch on the causal connection claim. So we believe the court should grant a certificate of appealability on the causal connection claim because Mr. Dietrich has made a substantial showing under Lockett and Eddings. The district court erroneously found this claim procedurally defaulted. Our position is that the Arizona Supreme Court's independent review exhausted this claim and especially in Mr. Dietrich's case because he specifically argued on direct appeal that the judge failed to adequately weigh and give effect to the mitigating circumstances. And he also cited Lockett in his reply brief on direct appeal to argue that the court may not constitutionally limit mitigation on any grounds. The district court alternatively found that the... I'm sorry, that the Superior Court and the Supreme Court both considered and gave effect to the mitigating evidence. The reason that we don't believe that is so in the context of this case is that the state argued all throughout sentencing that Mr. Dietrich's evidence of childhood abuse was not mitigating without a causal nexus to the crime. They argued that on direct appeal and they cited State v. Stokely and State v. Wallace which directly hold that a difficult family background are not mitigating without a causal connection. The Arizona Supreme Court identified in its ruling the mitigation that it did consider which included sentencing disparity, remorse and Mr. Dietrich being in an alcoholic state at the time of the crime but didn't even mention at all his childhood trauma or his long-standing issues with addiction. And the Supreme Court emphasized in its one paragraph discussion of the aggravation and the mitigation that the mitigation was less significant than it seems because Mr. Dietrich was cognizant of his surroundings and able to carry on a conversation during the crime. When you look at McKinney and you look at Mr. Dietrich's cases side by side they're strikingly similar in terms of the court's treatment of the causal connection or the mitigation evidence and the causal connection violation. So we would just really like this court to take a hard look at that claim as well. Do you want to reserve the rest? I would if there's no further questions. Yes. If you'll work with me for a moment I'm just going to move a few papers here. But Madam Chief and may it please the court I appreciate my friend focusing on claim B which is the exhausted claim that trial counsel was ineffective. Can you state your name? I'm sorry Madam Chief. My name is Jason Lewis. I represent Respondent Appalese. Thank you. Excuse me for interrupting you again but could you maybe move the microphones up a little bit so we can hear you a little bit better? Yeah I don't want to be misheard or unheard. That would be a trouble. So I appreciate my friend focusing on the exhausted claim, claim B. And if I can shift the court's focus on that claim the proper focus is whether or not the state post-conviction court unreasonably applied Strickland v. Washington. And in preparing for this I watched over this court's argument in 2013 and I think a lot of the questions were to the point on this matter. And it's whether or not there was an unreasonable determination not an incorrect one. And that unreasonable facet of the inquiry is dispositive here. If you just bear with me a moment. It sounds like at least from the court's questions to my friend that a lot of this hinges on how the state post-conviction court interpreted Dr. Briggs' psychological evaluation and whether or not that interpretation was unreasonable. And I would urge this court to adopt Judge McEwen's view in the last panel decision and her dissent that this is more properly a D1 inquiry and this isn't necessarily something that the court should look at under D2. And I will just say on the D2 point I don't think this court can fault the state post-conviction court for relying on Dr. Briggs' evaluation that Mr. Dietrich doesn't have any significant neurological impairment. In fact, that he is in the normal range for his neurological functioning. Well, it was some years after the crime, of course. Absolutely. And Dr. Briggs' report talks about that, that this is a recovered picture. But as I look at the Arizona recounting of that, it's not clear to me that they were taking that into consideration. First, you know, I'll echo my prior point that I don't think we can require state courts to list every single piece of evidence that we're relying on. And I think any fair reading of Dr. Briggs' report is that Mr. Dietrich is in the normal range for his neurological functioning. Even if that's a recovered picture. But again, through the lens of D2, I don't think this court can say I would have decided this differently in the first instance. I think this court has to say, was that unreasonable? Was it unreasonable for the state post-conviction court to rely on Dr. Briggs' overall conclusion that Mr. Dietrich's neurological functioning was within the normal range? And that unreasonable question is interesting because I think what it really asks is could any reasonable jurist have come to this conclusion? And, you know, I hate to shift to this subjective, but we've had several jurists agree with that conclusion. The state post-conviction court, I don't think there's any positive evidence in their decision that they ignored this recovered picture idea from Dr. Briggs' report. And one of the earlier questions asked, well, was Dr. Briggs asked to look at what Mr. Dietrich's functioning was in 1989? And if he wasn't, then I think that failure is imputed to post-conviction counsel. I think Mr. Dietrich bears the responsibility for any failure to direct Dr. Briggs' work towards this question of what his functioning was at the time of the crime. Dr. Briggs gave an evaluation based on whatever his mandate was from counsel. That was put in front of the state PCR court. And the state PCR court relied on Dr. Briggs' ultimate conclusion that Mr. Dietrich's neurological functioning was within the normal range. It's not unreasonable for the state post-conviction court to have looked at that evidence, to look at the additional sort of lay testimony through the declarations that are talking about a lot of the same things. Mr. Dietrich's admittedly bad childhood. He was a child of divorce. He endured suffering at the hands of his stepmother. He was introduced to drugs and alcohol as early as age nine. But that's information that the sentencer had. The sentencer had so much of this information from the two 1985 reports, from Dr. Boyer's 1990 report, from the three letters from Dietrich's sister, Diana Jo Stevens. And I understand this might be more effective if it's given live. But the reality is that the sentencing judge had the information. And if you just focus on prejudice, what was admitted in that initial collateral proceeding in state court wouldn't be enough to say that there's a reasonable probability of a different outcome if that evidence had been presented to the sentencer. I will make one note there. This is kind of a strange area and a strange time in Arizona because we are pre-ring here. And we have the judge making the determination of sentence along with Edmund Tyson and aggravation. And that same judge here sitting in post-conviction. And the judge makes a point that, and there's some language in its decision that I wouldn't have changed my sentence in this case. And that is admittedly subjective. But the Supreme Court and Shiro v. Landrigan recognized why trial judges are in a particularly good position to evaluate ineffective assistance of counsel claims when they're in post-conviction. Not necessarily because they can say based on their own impressions, no, I wouldn't have changed my mind if this evidence came in. But they have an intimate familiarity with the case that allows them to really objectively evaluate that evidence and say whether or not it would have changed the outcome of the trial that they presided over. To one of the questions asking whether or not the post-conviction court had the significance of the birth defect. And this is that cleft palate evidence. And whether or not there was any objective evidence of sort of a neurological impairment before the post-conviction court. My friend can really only point to the fact  to evidence that was admitted through the evidentiary hearing in district court. And, you know, I don't want to fault people for not being prescient and understanding or seeing where the Supreme Court is going to go. But that evidentiary hearing in district court was granted before the Supreme Court decided pinholster. That wouldn't happen post-pinholster. Pinholster makes it clear that that subsection D determination has to be made before you can even move on to the E2 question. On this record, that was before the state post-conviction court, Dietrich can't meet his burden to show either subsection for 2254D. And that's going to eliminate the opportunity for the federal court to use any of this new evidence. But even if you all find that Mr. Dietrich has met his burden and shows that this court doesn't have to give deference to the state post-conviction court, he still has to meet the requirements of E2. It's not suddenly a free-for-all on de novo review. E2 still limits whether new evidence can be admitted. And I know it's a tough exercise because all of this new evidence that wasn't before the state post-conviction court is in this record. But I think the Supreme Court's been clear that you have, Mr. Dietrich has to meet those requirements before that new evidence can be considered. And what precisely is the E2 requirement? So the E2 requirement, it speaks to fault. And so it's either an exception from E2, whether or not the fault is attributable to the petitioner. It can't be post-conviction counsel's fault, things like this, something external to the petitioner. And then whether or not there's a new rule of constitutional law that's made retroactive. And forgive me for the other requirement, new evidence. Assume for a moment that we can look at the evidence that was presented in the district court. Sure. What do we do with it? I think you go to the Supreme Court's most recent Strickland decision and Thornel v. Jones. And you look at whether or not, in considering all of the evidence, it would have changed the outcome. And this is a case much more like Jones. It would have changed the outcome with what degree of probability? A reasonable probability of a different outcome. And so I think this case is a lot more like Jones and a lot less like those cases my friend cites, Wiggins, Rompia, Porter. Because this is a case where there was significant mitigation put before the sentencing judge. The judge found five mitigating circumstances and there's no indication in the sentencing judge's special verdict or in the way he pronounced sentence that he didn't give those some effect. He just gave them the weight they were entitled to. So this is not a 0 to 100 case. This is more like a 75 to 100 case. There is some extra, but it's largely cumulative. The family history evidence is largely cumulative, again, because there were the three reports the sentencing judge had, along with the benefit of Diana Jo Stevens's letters to the court. There was evidence in those three reports. And if I can kind of step to the side and make a collateral point, I want to focus on Dr. Boyer's report. Because I think one of her findings is important to whether or not it was a strategic choice for trial counsel not to pursue other expert assistance. Dr. Boyer says in that report that based on my personality testing, I think Mr. Dietrich has antisocial personality traits. And I think this is important because this is a document that counsel knows the trial court will have access to. It's in the pre-sentence report. You can't keep this away from the court. And so counsel has a decision to make. Do I pursue other expert opinions and open my client up to a potentially damaging expert witness from the state? Or do I take what I have in this, along with the statements from Diana Jo Stevens on Mr. Dietrich's bad childhood, and put that before the court to give Mr. Dietrich a more neutral opportunity and not an opportunity for the state to secure a damaging expert witness and rebuttal and to put on perhaps even more damaging evidence that would have to be considered by the sentencer? I think that's a reasonable strategic choice. And we see elements of that even in Dr. Briggs's report. Dr. Briggs doesn't disagree with Dr. Boyer's conclusions concerning antisocial personality traits. I think Dr. Briggs actually agrees with that. And so what we have here is a client where there are perhaps indications in the record that there are some potential neuropsychological avenues that should be explored. But there's even more tantalizing indications that there's damaging evidence that will really harm the client before the sentencing judge. And instead of exploring that and presenting it to the court, it's better to rely on what we have, those three reports, along with Diana Jo Stevens' statements concerning Mr. Dietrich's childhood. And counsel, why would you describe the antisocial personality disorder as damaging rather than mitigating? I think it's widely accepted that at least in 1990, and you know, through the 90s, that was evidence that everyone tried to avoid having come in in a death penalty case in Arizona. Sentencing judges took that type of evidence and basically said, well, you know, a person with antisocial personality disorder doesn't care about the feelings of others. They only really care about getting what they wanna get. They have a complete lack of disregard for the feelings of others. And so that's exactly the type of evidence that would prevent a sentencing judge from finding the types of mitigating circumstances that the sentencing judge found here. Because what, you know, if there's evidence of, you know, strong evidence that the state is pursuing and presenting to the sentencing judge of antisocial personality disorder, the judge is gonna say, well, he said he had a bad childhood, but then he hurt all of these other people and hurt these families and all these things. I don't know if I'm gonna weigh that very heavily. To some of the points about impulsivity, you know, and I'll get to that in a moment, because I think I might have a more satisfactory answer on, like, how long the timeline is and how that relates to the state record. But this is all to say, at the time, it was standard practice for defense practitioners to try to avoid having an adverse antisocial personality disorder diagnosis come in from a state's rebuttal expert witness. I thought that the thread on that was that the idea that that type of person presenting that wasn't gonna be treatable and wasn't gonna be safe even in a prison environment, as to others. Right, and that's the double-edged sword. And I think I wanted to point that out, too, in terms of what would this impulsivity evidence have done if presented to rebut the aggravation evidence? And what I think, you know, I think this court has to consider is that double-edged sword. Could that evidence actually have hurt Mr. Dietrich? Because if he's putting in evidence of impulsivity and he's putting in evidence that, you know, argues that he couldn't control his conduct over this lengthy period of time, then how can he be subject to rehabilitation? Can he ever be in the community? Can he be safely housed? And that's certainly something that the sentencer would have had to evaluate in deciding whether or not to sentence Mr. Dietrich. We're doing now a lot of speculating about why that choice may or may not have been made. I appreciate that. Yes, unless you've got something in the record we missed about this being an affirmative choice. Is that fair, or did we miss something? What we don't have in the state court record before the PCR court is an interview with trial counsel. The interview with Mr. Higgins was introduced in the district court. So we don't have objective evidence of Mr. Higgins' subjective choices. So when you talked about the tantalizing indications in the report of why another expert may not have been procured, I think, but I just want to be clear, clear that I'm understanding you. Sure. That that is speculative and we don't know. Is that right? We don't know, but I think it's objectively reasonable when you see an indication like that the trial counsel would not pursue further expert testimony because... So your point is this could have been strategic for prong one purposes. Right. Okay, got it. Would you discuss the timeline too? I'm sorry, if you hadn't finished. No, absolutely. So what we know, the statement, I will kill you comes from Gwen Suter. She was the one who didn't see Mr. Dietrich or Mr. Charlton. She was in the other room. She heard a voice saying to her mother, I will kill you. She identified that voice at trial as being Mr. Dietrich's. Tammy Winsett testifies at trial that Mr. Charlton was telling her and basically boasting about how he had killed his ex-wife's lover. And I don't know what to make of that, but it's not the same as the I will kill you statement. What we know from the trial record is that both Mr. Dietrich and Mr. Charlton were upset apparently at the quality of the drugs that the victim, Elizabeth Suter, helped them procure. And we also know that Mr. Dietrich starts making these statements about how he's going to get what he's owed. And this is the evidence relating to the knife being seen held at the victim's throat. I believe that comes from Tammy Winsett's testimony. So we see a separation of the I will kill you statement from whatever Mr. Charlton told Tammy Winsett in the living room. Here, Mr. Charlton is saying, oh yeah, don't mess with me. I'm a bad guy. He's bragging, whatever. But Mr. Dietrich is saying, I will kill you in the course of those events where he's trying to get what he's owed or what he feels he's owed out of the victim. So he either feels like he wants his money, he wants good drugs, or he wants something else, which in his case was sex. And so that statement understood in that context isn't really attributable to Alan Charlton. That's something coming from Mr. Dietrich. And there's no evidence to show that Gwen Suter's testimony to that effect, that it was Mr. Dietrich saying this, isn't true. So we have that statement in the house. And again, that goes towards premeditation. We have Tammy Winsett who left the house. And as she's coming back, she sees the three of them getting into Charlton's car. And I think you had asked, Your Honor, at one point, if there was a knife outside. I read through the trial record. I don't think there was testimony that there was a visible knife outside at that time, that Ms. Suter was being sort of harangued into the car at knife point. It was dark. It was only moonlit. There was no streetlights. But we do know from that testimony from Tammy Winsett that she was forced into the car. What did we get from the after the fact statements? Again, way after the fact. Carbonell and Schell talk about, it's secondhand accounts of whether she was or was not led at knife point. Um, well, Schell wasn't there. And neither was Carbonell. I'm not suggesting that we're there in that eyewitness testimony. It's after the fact and secondhand. Um, I didn't see in the record from Tammy Winsett. So our firsthand witness, she didn't testify that she could see a knife leading the victim out to the car. I wasn't talking about the eyewitness testimony. But I'm waylaying you. Go right ahead. It doesn't matter. That's okay. And I apologize for not maybe getting... You were trying to get to Judge Graber's question about the length of time. Okay. And so we have this transaction from the threats in the house. Tammy Winsett leaving to go use a telephone to call 911. And I think that's that 1.32 a.m. thing. So we don't know exactly when she left the house, when she returned. We know when she made the phone call. But then she comes back. She sees the two men forcing Ms. Souter into the car. And then they leave. And so to your question, Your Honor, about, well, this seems like a pretty long period of time. How is this impulsive? We don't have a lot of information about the exact amount of time. But we do have information about the different things that are happening in that transaction. We have information about how that whole interaction went sour when Mr. Dietrich became unhappy with the quality of the drugs. To be clear with respect to the knife that was held at her throat at the house, we know that's not the murder weapon. Yeah, I believe that knife was still found at the house. I think that's clear. I think that's exactly right. So then there's this sequence. It takes however long it takes to get into the car. And then there's a time period in the car. And we don't know how long that is either. I think our best evidence is from Alan Charlton's testimony. And take that for what you will now. But we know that the jury took that for what it was then and found Mr. Dietrich guilty. Well, so but what do we get? I keep trying to get back to Judge Craver's question. What do we get? What's your best shot about how long this took in terms of whether it was impulsive or not? I think it took more than five minutes. I mean, what you have is- Being left in the house and being killed. That's harder. I don't know that. I mean, that's the big question mark. I think that is the timeline we're talking about. Because the question is whether this was an impulsive act. And my statement was there's a lot of time to stop. And that's what I'm trying to push against. How long from the discovery of the drugs being bad, apparently, until she was murdered in the car. And I don't mean to belabor the point. I've looked at the record awfully hard. I can't get an answer to that question. Yeah, and I think the best information we have is that there was a clear escalation with a lot of opportunity to stop that escalation. And that Mr. Dietrich didn't take that opportunity, even though he had it. Can I ask you about Mr. Carbonell? He testified at trial that Mr. Dietrich confessed to killing Sauter. But in his 1990 interview with the defense investigator, he said only that he surmised that Dietrich was the one who killed her. I guess I just wanted to find out why wasn't the trial counsel's failure to cross-examine Mr. Carbonell on that point an important inconsistency or possibly prejudicial? So is this in Claim A, one of the Martinez-remanded claims you're asking about, Your Honor? I think it is. I think so. Because if this is going to guilt, this wouldn't be in Claim B, IAC, and mitigation, would it? The question in Dietrich 5, though, boiled down to if there was, you know the line, if there was additional evidence that cast the blame slightly differently, the balance, if less evidence that Dietrich was the actual killer and more evidence that Charlton was, would that have made a difference at sentencing? It was always about sentencing. Right. Right. So let me rephrase the question, which is really annoying, and I apologize for that. And you tell me if I'm wrong. But as to Carbonell and whether or not he would have been impeached with this other statement, that, well, I was only guessing at what, you know, Dietrich was telling me based off of these other factors, that Charlton was driving. He said he killed a girl. First, I think those are fair inferences, and I don't think getting on the record that the witness that Carbonell made inferences from that would have really changed the way the sentencing judge looked at mitigation. I think there's other evidence in the record that still upholds the judge's finding that Dietrich was the actual killer. You know, this includes the blood evidence about Dietrich having more blood on his overalls. And I appreciate there's new stuff that was introduced in the federal proceedings, but we kind of have to shut our eyes to that, I think. Well, maybe. Maybe, right. Yeah, it's always a maybe in this stuff.  So it's one sentencing judge. And that judge knew, this is in Dietrich 5, that three of the jurors convicted only on felony murder, right? So that's why this matters, at least for I'm one of 11. That's why this matters to me, about was there additional doubt? Would there have been lingering doubt? Would that have mattered at sentencing? Hence, Chief Judge McGee's question is important, I think. So this strikes me as one of his strongest claims. The testimony, secondhand, of a confession is powerful, right? So what's your best response to that? First, I'm going to reiterate the argument that didn't land with the plurality. But that's that just because the jury, or at least some jurors, didn't find that premeditated murder was proof beyond a reasonable doubt, doesn't mean that they didn't believe that Dietrich was the actual killer. And I appreciate that the plurality had a different view of that. But I think that's the logical conclusion, that we can't surmise from the lack of a verdict on premeditated murder that those jurors did not believe that Mr. Dietrich was the actual killer. And then as far as the evidence goes linking Dietrich to the murder, we have all of his conduct against the victim leading up to finding her body in the desert. We have the eyewitness testimony of him saying, I will kill you, to Elizabeth Souter. We have testimony that he was the one mad with her about the drugs and that he was going to get what he wanted from her. You say eyewitness testimony, I will kill you? Earwitness testimony. Earwitness testimony. That testimony itself is questioned as to the identity of the speaker. I appreciate that, Judge. But at least when we look at E1, nothing has been presented to refute the correctness of the state record on that point. But we have testimony about Dietrich's interactions with the victim leading up to her body being found in the desert. And I think that's enough to support the trial court judges finding that Dietrich was the actual killer, even when considering Carbonell's equivocation after the fact. If I can pivot, unless there's any other questions on Claim B, or I appreciate the question on Claim A. I don't think you all want to hear me talk a lot about Ramirez and E2, but that's our position and what the Supreme Court has done in this area. But on the causal nexus claim, I'll just make a quick pitch that this isn't the type of decision from the Arizona Supreme Court that this court signaled in McKinney demonstrates the type of causal nexus claim that the court identified. We don't have a positive statement that the Arizona Supreme Court is disregarding a certain type of mitigating evidence because it has not been connected to the facts and circumstances of the crime. I'll admit there is a citation to Stokely in the Arizona Supreme Court's opinion on its independent review. But if you follow that through and go to the proposition Stokely's being cited for, it's not about the impact or availability of family history evidence on mitigation. I believe the citation to Stokely talks about disparate sentences and when a disparity can even be considered as a mitigating circumstance. And just that point on Stokely, it's basically saying only unexplained disparities in sentences can be considered mitigation. Those are the only ones that can be relevant. So the citation to Stokely wasn't for that improper purpose that this court identified in McKinney. And there being no positive indication that the Arizona Supreme Court applied an unconstitutional causal nexus claim, the time period alone isn't enough to entitle Mr. Dietrich to relief on that claim. If there are no other questions, I would respectfully ask that this court affirm the district court and deny the writ of habeas corpus. Thank you. Your Honors, I'll try to get through the points I'd like to address that Mr. Lewis raised. Mr. Lewis pointed out that the state court's decision can't be unreasonable because Mr. Dietrich was in the normal range at the time of Dr. Briggs' testing. I just wanted to emphasize that he was at 25 in general impairment, where 26 is the cutoff for normal. And so that in combination with Dr. Briggs' other language about this being a recovered picture and about there being impairment, I think was really important and disregarded by the state court. Ms. Armstrong? Yes, sir. How do you square that statement you just made now with Dr. Briggs' report on page three, which says, with regard to tests specific to the neuropsychological functions of each cerebral hemisphere, the patient does not demonstrate a pattern of cognitive dysfunction. Where is there any evidence that there was cognitive dysfunction in 2000, pardon me, in 1989 or 1990 or 1991 in view of Dr. Boyer's finding that there was no cognitive dysfunction in 1991? Your Honor, I believe I gave you the best citations for that, which are at 5 ER 1178, where he finds mild neuropsychological deficits. He finds that there's greater overall impairment and function in light of the trauma and the alcohol. I don't know that I, and when he specifically discuss the Halstead-Ritan results, that's the evidence of impairment, Your Honor. I would like to also push back a little bit on Mr. Lewis's characterization of the evidence in front of the sentencing judges as a weighty. I mean, these were two, these were a couple of letters that were written haphazardly and desperately by Mr. Dietrich's sister with no guidance from counsel whatsoever. These were psychological reports that were based on self-report by Mr. Dietrich and personality testing. There was no collateral data. There were not meaningful interviews. There was no live witness testimony as Mr. Lewis admitted. And I think that Mr. Lewis is correct that this court has to look at cases like Jones, Shad, and Kher in considering whether we can satisfy D1 and D2 after Penholster. But when you look at those cases, you'll see Mr. Dietrich's case is quite different. There were 11 mitigators and 15 live witnesses at Mr. Shad's sentencing. There were three aggravators. In PCR, there was investigative funding and 27 extensions of time for counsel to develop evidence. In Jones, there were live witnesses and a mental health expert at sentencing. There were three victims, four aggravators. There was an investigative funding and a hearing in post-conviction. And there was no causal connection made in the evidence that Mr. Jones did present in post-conviction. In Kher, the client interfered with the mitigation development. There was heavy aggravation, but yet there was a nine-day hearing in post-conviction plus investigative funding. And the mitigation that resulted from that was questionable whether it was even proved. So when you look at the leading Penholster cases against Mr. Dietrich's case, we feel that we're quite different and relief is still warranted under 2254 D1 and D2. Your honors, just in closing, I know I'm out of time. I would just like to say that Mr. Dietrich, when you look at this case as a whole, was not afforded individualized consideration either because of his trial counsels, sentencing counsels and effectiveness and the causal connection test that was alive and well in Arizona at the time. And this court should grant the writ on one of those claims. Thank you so much. All right. Thank you, Ms. Armstrong. Mr. Lewis, appreciate your oral argument presentations here today. The case of David Scott Dietrich versus Ryan Thornhill is now submitted. We are adjourned. Thank you. All rise.
judges: MURGUIA, THOMAS, GRABER, FLETCHER, GOULD, BEA, CHRISTEN, NGUYEN, OWENS, BADE, LEE